UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID GASCOT LUGO,

Petitioner,

v. Case No.: 6:23-cv-842-AGM-LHP

RICKY D. DIXON,

Respondent.

______________________________/

ORDER

THIS CAUSE is before the Court on Petitioner David Gascot Lugo's Petition for Writ of Habeas Corpus ("Petition," Doc. # 1) filed pursuant to 28 U.S.C. § 2254. Respondent filed a Response to the Petition ("Response," Doc. # 16). Petitioner filed a Reply to the Response ("Reply," Doc. # 23). For the reasons set forth below, the Petition is due to be denied.

## I. PROCEDURAL HISTORY

The State charged Petitioner, Luis Gabriel Burgos Rosado ("Rosado"), Malvin Ramos Cruz ("Cruz"), Erika Enid Negron Rivera ("Rivera"), Juan Ramon Melendez Marquez ("Marquez"), Miguel Angel Valentin ("Valentin"), and Manuel Angel Calderon[1] ("Calderon") with racketeering (Count One); Petitioner, Rosado, Cruz, Marquez, Calderon, and Omayra Rivera Ocasio ("Ocasio") with trafficking cocaine (Count Two); Petitioner, Rosado, Cruz, and Rivera with trafficking cocaine (Count Three); Petitioner, Rosado, Cruz, Rivera, Marquez, Ocasio, and Calderon with conspiracy to traffic cocaine (Count Four); Petitioner, Rosado,

[1] The Information indicates that Calderon's last name is Calderon. (Doc. 17-1 at 18–25.) At trial, however, Calderon testified that his last name is Diaz. (*Id.* at 381.) In this Order, the Court will refer to Calderon as identified in the Information.

Cruz, Rivera, Marquez, Valentin, and Calderon with unlawful use of a two-way communication device (Count Eight); and Petitioner and Rivera with tampering with physical evidence (Count Nine). (Doc. # 17-1 at 17–31.) A jury convicted Petitioner of Counts One through Four and Eight, and the State *nol prossed* Count Nine. (*Id.* at 59–68, 95, 184.) The state court ultimately sentenced Petitioner to twenty-five-year terms of imprisonment for Counts One through Four with fifteen-year minimum mandatories for Counts Two through Four and to time served for Count Eight, with all sentences to run concurrently. (*Id.* at 1090, 1096–97.) Petitioner appealed, and the Fifth District Court of Appeal of Florida ("Fifth DCA") affirmed *per curiam*. (Doc. # 17-2 at 69.) Petitioner filed a state petition for writ of habeas corpus. (*Id.* at 73–108.) The Fifth DCA summarily denied the petition. (*Id.* at 130.) Petitioner also filed a motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850, which he amended. (*Id.* at 140–79, 190–229.) The post-conviction court denied the amended Rule 3.850 Motion. (*Id.* at 260–69.) Petitioner appealed, and the Fifth DCA affirmed *per curiam*. (*Id.* at 370–81, 387.) Because the Petition can be appropriately resolved on the record, an evidentiary hearing is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

## II. EVIDENCE ADDUCED AT TRIAL

As summarized by Petitioner on direct appeal, the following evidence was among the evidence presented at trial:

> Juan Melendez [Marquez] met [Petitioner] in Puerto Rico and then [Petitioner] moved here. He was familiar with [Petitioner's] voice. [Marquez] lived at Valencia Trace apartments in apartment number 304. [Petitioner] also lived at Valencia Trace apartments and was [Marquez's] neighbor. Omayra Rivera Ocasio was [Marquez's] wife. Ocasio knew [Petitioner] from when she used to live in Puerto Rico in the same neighborhood. Petitioner's wife was named Erika Negron Rivera.

During the summer of 2017, during an activity at the pool complex, [Petitioner] offered [Marquez] an opportunity to make $500 by providing his address to receive a package. He was to receive $500 for every package received. [Petitioner] told [Marquez] that the packages would contain cocaine, also known as “perico”. [Petitioner] told this to [Marquez] in person, not on the phone. “Perico” was also [Petitioner’s] nickname.

In August [Marquez] received a package by mail. He did not open it. [Marquez] received $500 from [Petitioner] for this package.

Police initiated an investigation of a street-level narcotics dealer. Police eventually placed a wiretap on the person’s phone which led police to the sources of supply. Police monitored and recorded a series of telephone calls pursuant to the investigation. On October 28, 2017, Malvin Ramos Cruz called [Petitioner] at 6:47 p.m. Based on this call, police believed there was a package inbound to [Petitioner] and they began to monitor his residence and waited for the package to be delivered. There was a reference to expect the delivery on Monday, October 30th.

[Marquez] received a package on October 30th. It was a postal box that was left at the front door to his apartment by a postal worker. There was supposed to be cocaine inside the box. Marquez did not give the package to [Petitioner]. Marquez did not pick it up. This was the package he had talked to [Petitioner] about on the phone.

Marquez communicated with [Petitioner] on the phone that day regarding the package. On the calls between [Marquez] and [Petitioner], [Marquez] referred to the box as “tennis shoes” or “sneakers”. During none of the calls was there a reference to cocaine by the word “cocaine”. [Petitioner] told [Marquez] to hold the package because [Petitioner] already sold it to other people. [Marquez] did not wish to hold the package because if the package were to disappear, [Marquez] would have to pay for it. [Petitioner] tried to put his mind at ease by telling him that [Petitioner] would take responsibility.

On October 30, 2017, using surveillance techniques, police saw that when Agent Rodriguez dialed [Petitioner]’s phone number, [Petitioner] picked up his handset and answered it.

According to a police-monitored phone call, on October 30, 2017, [Petitioner] called Juan [Marquez] at 3:55 p.m. [Petitioner] talked about a trip coming up and that there were five. [Petitioner] said that one can get lost. This call led police to believe that five packages were in-bound, most likely through U.S. mail, and that they contained narcotics. It also led police to believe that Juan [Marquez] was most likely going to be a recipient of at least one of those packages.

[Petitioner] called [Marquez] again that same day at 4:34 p.m. In response to the call police sent surveillance units to the area of [Petitioner]'s residence because from the call police believed packages had been delivered to the doorsteps of some of the residences.

At 5:16 p.m. on October 30, 2017, [Petitioner] called Malvin Ramos Cruz. At that point Agent Healy had already asked for surveillance units to be in the area.

At 5:58, Juan [Marquez] called [Petitioner]. In the call there were references to "sneakers" and "Perico" and the mailman. They talked about meeting and Petitioner talked about turning in paperwork from a trip. [Petitioner] advised [Marquez] to say that when he got there, there were no sneakers there, as if it were lost. In response to that call, agents set up on the parking lot of the Grande Valencia apartment complex. Agents had been able to identify addresses for Juan [Marquez] and [Petitioner]. They lived in the same building. They did not identify the address for the third-party neighbor at that time.

At 6:01 p.m., [Petitioner] again called [Marquez]. At 7:15 p.m., [Petitioner] called [Marquez]. Based on the call, police learned there was something that they considered a gift inside the box. [Petitioner] said during the call that he was downstairs and said he was "going to take Saulo's first and then I'll turn up and pick up that one". "Saulo" was a reference to another resident of the apartment complex. [Marquez] said he was coming back at night, but going to church. [Petitioner] responded, "then break it . . . break the box and bring the gift that is inside".

[Marquez] was directed by [Petitioner] to not turn in the package that [Marquez] had that night. At that moment, [Marquez's] wife, Ocasio, was not aware of [Marquez's] dealings with [Petitioner]. However, after [Petitioner] called him that

night, [Marquez] told her. His wife panicked in reaction to a package of cocaine being in their home. She pressured [Marquez] to get rid of it. [Marquez] called [Petitioner] the next day so [Petitioner] could pick it up in the morning. [Marquez] was not there for the "handoff".

On October 30, 2017, Ocasio was not aware of any business dealings between her husband and [Petitioner]. On that day a package arrived at her home. It seemed strange to her because she noticed a similar package next door. It was a square package addressed to "Pedro Lopez" with Ocasio's address. She did not know who Pedro Lopez was and he did not live at her house. It was a white priority box with blue and red letters. She confronted her husband that day, later in the evening. She tried to open the package but did not. She asked him what was going on with the package. He told her to calm down and that everything was going to be fine. Later that night, after she found out what was inside the package, she told [Marquez] that her kids were there, her mother in-law was there and that she wanted the package out of the house now.

At some point Ericka, [Petitioner]'s wife, called Ocasio and Ericka passed the phone to [Petitioner]. Ocasio told [Petitioner] to get the package out of her house as soon as possible. She told him she was going to place the package outside her door. He told her no. He told her he would call her back and then he knocked on her door. She gave [Petitioner] the package.

Manuel Calderon was a truck driver and knew [Petitioner] from where they park the trucks. They were both truck drivers. Calderon's nickname was Cano. Calderon knew other truckers named Luis Burgos Rosado and Malvin Ramos Cruz. He worked on Rosado's truck and Cruz was the person who put Calderon in [c]ontact with [Rosado] to do the repair work on [Rosado]'s truck.

On the evening of October 30, 2017, Calderon was at the yard changing one of his truck tires. [Petitioner] was going to lend him his own vehicle, a white Trail Blazer. Police had set up a camera in the truck yard where [Petitioner] worked as a truck driver. He took trips as part of his employment. In the evening, Calderon went with [Petitioner] in [Petitioner]'s car to [Petitioner]'s apartment complex. Calderon stepped outside the

vehicle to smoke. [Petitioner] left and then returned to the vehicle with a giftwrapped package. [Petitioner] placed it in the rear seat or in the back behind the seat. They then left [Petitioner]'s apartment complex.

Through surveillance, police saw Ocasio come down with her husband ([Marquez]) carrying in a bag the gift box that had been removed from the postal package. There was a white Chevy Trailblazer parked outside. There were multiple people outside the truck sitting around talking. Agent Healy did not know who Calderon was at the time. The package in the bag went to [Petitioner] in the car. It was the same package that Calderon was later charged with possessing. Calderon was outside with the other persons.

Agent Healy was able to remotely observe [Petitioner] leave the parking lot of his residence. The undercover surveillance units already on scene were asked to surveil [Petitioner] from his apartment complex and police requested the assistance of an Orange county [sic] marked patrol unit and OPD for a K-9 unit for a traffic stop to be conducted. The surveillance units were undercover.

As [Petitioner] and Calderon drove on I-4, a police car appeared behind them without lights activated. [Petitioner] then placed the package in the front seat between Calderon's legs. The police then police pulled them over. While they were still in the car, [Petitioner] told Calderon to tell police that a person named Tony had given them the package. Police first removed [Petitioner] from the vehicle and then Calderon. A K-9 unit subsequently arrived. When the police officer told Calderon to move back because the dog got excited, Calderon said to [Petitioner], "Don't tell me you have drugs in there," and [Petitioner] answered, "Yes." When Calderon was interviewed by law enforcement, he told them the cover story, which was a lie.

A roadside video was taken. Calderon had the opportunity to watch[,] and it included [Petitioner]'s interview with police. [Petitioner] told the police that Calderon had brought the package and did not tell the police the cover story that a person named Tony had given them the package. Police detained Calderon and allowed [Petitioner] to go home.

While they were at the roadside, [Petitioner] called his wife. He and Calderon spoke Spanish, but the officers did not. [Petitioner] told his wife to remove a package or a gift from his house.

The State charged Calderon with one count of trafficking for this case. Calderon reached an agreement whereby his charges would be dismissed if he told the truth.

Deputy Brendan Moore was assisting the Metropolitan Bureau of Investigations on October 30, 2017. He was directed to conduct a traffic stop of a white SUV. It was a planned and coordinated traffic stop. . . .

* * *

Moore searched the vehicle and seized a gift-wrapped box that contained another box for a foot massager and inside that was a multiple-layers of cellophane and then a black latex layer and then several layers of newspaper and dryer sheets and then more cellophane and then cocaine. Inside the box was one kilogram (1001.32 grams plus or minus 0.15 grams) of cocaine wrapped in black newspaper and plastic wrapping.

* * *

A detective on-scene interviewed [Petitioner] and Calderon in Spanish and then relayed the information to Moore. The detective relayed to Moore that Calderon said that he received the package from a person named Tony from 7-Eleven but did not know its contents.

* * *

Healy asked Moore to allow [Petitioner] to use his phone while on the scene of the traffic stop so that could police continue with their investigation into the larger organization. Moore saw [Petitioner] make a phone call while on the scene. Broadhurst saw one of them talking on a cell phones [sic] and saw them talk to each other.

Even though there was probable cause to arrest both of them, Healy asked Moore to release [Petitioner]. Agent Healy testified that it was his decision to arrest Calderon and let

[Petitioner] go. However, Moore testified that he himself made the decided to arrest Calderon but not [Petitioner]. Moore decided to arrest Calderon based on his proximity to the package and his statements.

On October 30, 2017, at 8:21 p.m., [Petitioner] called Malvin Ramos Cruz. This was the first call made by [Petitioner] after the traffic stop. On this call, [Petitioner] informed [Cruz] that [Petitioner] had been stopped by police and that he was not sure if the police were going to arrest him or not. [Petitioner] told Cruz to throw away his phone. [Cruz] told [Petitioner] to erase all the messages and "tell them you were delivering the packages, you got them, and that you were taking them back". [Petitioner] responded, "No. It was the gift. I took the gift. Okay".

At 8:38 p.m., [Petitioner] called his wife, Erika. [Petitioner] told her to put something outside in the trash and to do it quickly but to look first. [Petitioner] told her[] that it arrived there and she did not know anything just in case people knock. His wife said she called Renecito and, at the end of the conversation, [Petitioner] told her to tell Rene to hurry and stop by so he can hurry and take it out. [Petitioner] told her to then go inside and lock the door. She then said Rene was calling her. Based on this phone call, Agent Healy requested surveillance units to return to [Petitioner]'s address to recover anything that was discarded out the front door.

At 9:08 p.m. [Petitioner] again called his wife. [Petitioner] told her they were taking them to "the 33rd" and directed her to call "the one I told you". He made references to "El enano" and "Malvin". [Petitioner] said, "Give him that. . . ." [Petitioner] told her that when she talked to him to "[t]ell him to tell Gordito not to - not to do anything" and to "keep calm and wait for me to tell him". "Gordo" means "fat" and "Enano" means "midget". Juan [Marquez] was heavier set[,] and Malvin Ramos Cruz was short.

As a result of the surveillance units rushing back to [Petitioner]'s residence, police found there a United States Postal Service Priority Mail box. The package was addressed to Felix Viera, 131 Grande Valencia Drive, apt. 208, Orlando, FL 32825. It possibly was a fictitious name. Another name on one of the package [sic] was "Pedro". Healy had no information whether "Pedro" was a real person or not. Inside the Priority Mail box

was a gift-wrapped present. In it was newspaper, multiple layers of cellophane, latex, dryer sheets and finally a kilo of cocaine (1000.76 grams). It was an almost identical package [to the package] found during the traffic stop of [Petitioner].

No one saw Erika put the package outside but police believed she had done so. The address on the package was [Petitioner]'s address where the wife also lived. Healy did not believe [Marquez] put the package there. [Petitioner] and [Marquez] were talking to each other about packages. In the past packages had been delivered to [Marquez's] residence. Based on phone calls, Healy believed that [Marquez] and his wife left for church immediately after delivering the first package to [Petitioner] – from the parking lot they left at about 7:30 p.m. [Petitioner] did not call [Marquez] during the traffic stop. The traffic stop was around 8 p.m.

At 9:29 p.m., [Petitioner] called a person whom police never identified. During the call [Petitioner] said they had been following him for days. He said they stopped him on the John Young exit and the unidentified male responded, "Aha . . . with one?" and [Petitioner] answered "Yeah". The male asked "where is the other one?" and said that Erika called him and when he went over there she told him they took it. [Petitioner] called him a liar and told him he had to give him something. A kilogram of cocaine and its packaging were taken from [Petitioner]'s car that night. At the time of the call, the substance had not yet made it to MBI and had not been opened. "A whole one" refers to one kilogram of cocaine.

At some point [Petitioner] called [Marquez] and told him he had been pulled over and stopped by the police on the night of October 30th. [Petitioner] told [Marquez] that he was "carrying a present". This was a reference to cocaine. In none of the calls with [Petitioner] did they refer to "cocaine". [Marquez] never opened one of the packages to see what was inside. [Marquez] knew what was inside the package because [Petitioner] told him. . . .

[Marquez] was arrested on November 30, 2017[,] and went to jail for 121 days. His wife also went to jail. The State charged Calderon in Count 1 with racketeering. Agent Healy considered [Marquez] to be an associate of the organization and that he knew what was happening. Police believed Calderon was

aware the cocaine was in the vehicle[,] or he would not have made up the story to explain it.

[Marquez] cooperated with the State[,] and in exchange he was released from jail without posting a bond. Per his plea agreement with the State, his sentence will be reduced greatly from the minimum mandatory in exchange for telling the truth. He still expected to do prison time. He was charged with trafficking and conspiracy. . . .

The State charged Omayra Ocasio with trafficking and conspiracy to traffic based on her receiving packages on behalf of her husband at their residence. Agent Healy had a basis to believe she knew what was inside the packages. In exchange for Ocasio's cooperation, her charges were to be completely dismissed. . . .

Based on law enforcement's continued investigation after October 30, 2017, other parties were identified through continued phone wiretap monitoring. In November of 2017, police monitored and recorded additional calls as part of the investigation. Based on electronic surveillance, intercepted communications and actual agent surveillance, police knew a package had arrived and was being moved and this eventually led to Malvin Ramos Cruz's arrest. . . .

On November 15, 2017, Luis Burgos Rosado called Malvin Ramos Cruz. They did not metion [sic] [Petitioner] by name or by nickname. They talked about bail and the charges for Manuel Calderon. "Cano" was Calderon. Based on the conversation, Calderon had nothing to do with this. They continued their conversation in a second call made by [Cruz] to [Rosado]. They talked about how to get Calderon out of jail. They talked about Calderon and [Petitioner] talking to each other to come up with a story. "Periquin" was a nickname for [Petitioner]. Based on these conversations, Calderon should not have been in the car. The conversations indicated that they were pooling their money for Calderon's bail. The reference in the conversation that Cano was being blamed for "one" was a reference to a kilo of cocaine. In the conversation, the reference to two "shirts" being lost was a reference to the two kilos of cocaine that police had seized and that the cost was to be born by [Rosado].

On November 21, 2017, at 6:18 p.m., [Rosado] called Ramos. "Gordo" was mentioned in the call and was Samuel Ramos, who was not a defendant in this case. The reference in the call to a "shirt" was believed to be a reference to a kilo of cocaine. The reference to "32 stacks" typically is code for $32,000, a "stack" is a thousand dollars. . . There was no mention of [Petitioner] by name or nickname in this call. They talked about "the old man," which was a reference to Calderon, whom they also called "Viejo" and was also known as "Cano". . .

On November 24, 2017, [Rosado] called [Cruz]. Based on references to "T-shirts," police believed at least one additional kilogram of cocaine was at play. During the call[,] they never mentioned [Petitioner].

On November 26, 2017, at 12:38 p.m., [Rosado] called [Cruz]. Based on this call, Agent Healy requested "troops to be mobilized". During the call[,] they never mentioned [Petitioner]. At 6:26 p.m., [Rosado] again called [Cruz]. During the call[,] they never mentioned [Petitioner]. . . .

Based on the calls up to that point, Healy summoned the assistance of a marked unit to conduct a traffic stop of [Cruz]. Police initiated a traffic stop of [Cruz] on November 26th and found the package in the trunk. [Cruz] was the only occupant of the vehicle. The package consisted of a white USPS box and inside the box was another box wrapped in wrapping paper. The inside box was afoot [sic] massager box. . . . Inside the foot massager box was the kilo of cocaine (1002.69 grams). . . . [Cruz] was arrested and charged with trafficking in cocaine and possession of a firearm in the commission of felony.

The package seized from [Cruz's] vehicle was packaged and delivered in the same manner as the other packages intercepted by police. However, police had no proof that [Petitioner] knew about the package or that he handled it in any manner.

Agent Scott Pennington arrested Luis Burgos Rosado at the airport and served a search warrant for Rosado's cell phone… Police discovered in the "recently deleted" folder of the phone photos that had been "deleted" maybe a day or two earlier. Photos marked for deletion sit in the "delated [sic] folder" for 30 days and for these particular photos there were 29 days

> remaining. The four photos consisted of: (1) a photo taken on October 28th of a receipt for shipment upon which had been handwritten written the address of "131 Grande Valencia Dr., apt. 208, " which was [Petitioner]'s address, and indicating an expected delivery date of October 30, 2017; (2) a photo taken on October 28th of a receipt for shipment upon which had been handwritten written the address of "131 Grande Valencia Dr., apt. 304," which was Juan [Marquez's] address, and indicating an expected delivery date of Monday, October 30, 2017; (3) a photo taken on October 26th of a United States Postal Service Priority Mail shipping label addressed to Felix Viera, 131 Grande Valencia Dr., apt. 208, Orlando, FL 32825; and (4) a photo taken on October 26th of a United States Postal Service Priority Mail shipping label. The address was partially obscured but included the characters "131 G" and "APT 3" and "FL 32". Police discovered another photo on [Rosado]'s phone of a United States Postal Service box with a Priority Mail shipping label addressed to Pedro Valentin at 5929 Bent Pine Dr., apt. 705, Orlando. The return addressee was Jose Valentin and an address in Puerto Rico.

(Doc. # 17-2 at 20–41) (citations omitted).

## III. GOVERNING LEGAL STANDARDS

### A. Standard Of Review Under The Antiterrorism Effective Death Penalty Act ("AEDPA")

Under the AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the Supreme Court of the United States "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A federal habeas court must identify the last state court decision, if any, that adjudicated the claim on the merits. *See Marshall v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1277, 1285 (11th Cir. 2016). Where the state court's adjudication on the merits is unaccompanied by an explanation, the habeas court should "look through" any unexplained decision "to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as alternative grounds briefed or argued to the higher court or obvious in the record it reviewed. *Id.* at 125–26.

For claims adjudicated on the merits, "section 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001). "For a state-court decision to be an 'unreasonable application' of Supreme Court precedent, it must be more than incorrect—it must be 'objectively unreasonable.'" *Thomas v. Sec'y, Dep't of Corr.*, 770 F. App'x 533, 536 (11th

Cir. 2019)[2] (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). If a state judge fails to resolve the merits of a claim, however, no deference is warranted under § 2254(d)(1). *Calhoun v. Sec'y, Fla. Dep't of Corr.*, 607 F. App'x 968, 970–71 (11th Cir. 2015) (citing *Davis v. Sec'y for Dep't of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003)).

Under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court is presumed correct, and the habeas petitioner must rebut the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

Where the state court applied the correct Supreme Court precedent, the federal court must consider whether the state court unreasonably applied that precedent or made an unreasonable determination of the facts. *Whatley v. Warden*, 927 F.3d 1150, 1181 (11th Cir. 2019). "'[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.'" *Id.* at 1175 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Federal courts may review a claim *de novo* only if the state court's decision was based on an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts. *Id.*

**B. Standard For Ineffective Assistance Of Counsel**

In *Strickland v. Washington*, the Supreme Court established a two-part test for

[2] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

determining whether a convicted person is entitled to relief because his counsel provided ineffective assistance. 466 U.S. 668, 687-88 (1984). To prevail under *Strickland*, a petitioner must demonstrate "(1) that his trial 'counsel's performance was deficient' and (2) that it 'prejudiced [his] defense.'" *Whatley*, 927 F.3d at 1175 (quoting *Strickland*, 466 U.S. at 687).

Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. That is, "[t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

The Eleventh Circuit Court of Appeals has applied *Strickland* to ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991). "In the context of an ineffective assistance of appellate counsel claim, 'prejudice refers to the reasonable probability that the outcome of the appeal would have been different[,]" *i.e.,* the appellate court would have granted the petitioner a new trial or sentencing hearing but for counsel's deficient performance. *Clark v. Crosby*, 335 F.3d 1303, 1312 n.9 (11th Cir. 2003) (quoting *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001)).

A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both *Strickland* prongs, and a court need not address both prongs if the petitioner has made an insufficient showing on one. *See Strickland*, 466 U.S. at 697; *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001). Moreover, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562

U.S. at 105 (internal quotation marks and citations omitted). Thus, if "§ 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## IV. ANALYSIS

### A. Ground One

Petitioner asserts the trial court's admission of recorded phone calls that occurred after October 30, 2017, the date on which Petitioner was arrested and when the conspiracy concluded, violated his constitutional right to a fair trial. (Docs. # 1 at 5; 23 at 2–3.) Petitioner argues that the statements in these recorded calls were inadmissible because they were not made during the course of, or in the furtherance of, the conspiracy and involved discussions about legal strategy, sentencing exposure, and bailing out Calderon. (Doc. # 23 at 2–3.)

Petitioner raised this ground on direct appeal. (Doc. # 17-2 at 42–48.) The Fifth DCA affirmed *per curiam*, citing *Calvert v. State*, 730 So. 2d 316, 319 (Fla. 5th DCA 1999).

The United States Supreme Court has indicated that declarations of a conspirator may be used against another conspirator, "and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party." *Lutwak v. United States*, 344 U.S. 604, 617 (1953) (citing *Clune v. United States*, 159 U.S. 590, 593 (1895)). Such declarations, however, may be "used against the co-conspirator only when made in furtherance of the conspiracy." *Id.* (citing *Fiswick v. United States*, 329 U.S. 211, 217 (1946)). Once the conspiracy has ended, "there can be no furtherance of a conspiracy[.]" *Id.* at 617–18. Consequently, "the declarations of a conspirator do not bind the co-conspirator if made

after the conspiracy has ended[,]" and thus, they are inadmissible against the co-conspirator. *Id.* at 618.

Consistent with federal law, under Florida law, a co-conspirator's statements made after the conspiracy has concluded are inadmissible against another conspirator. *Calvert*, 730 So. 2d at 319. Nevertheless, a trial court's erroneous admission of a co-conspirator's statement against another conspirator is subject to harmless error review under federal and state law. *See Lutwak*, 344 U.S. at 619–20 (concluding the admission of a statement made after the conclusion of the conspiracy against all conspirators was harmless error); *see also Calvert*, 730 So. 2d at 319 (concluding the admission of co-conspirator's statements made after the conspiracy ended was harmless error given the evidence establishing the conspirator's guilt).

Further, the Eleventh Circuit Court of Appeals has explained:

> We review state court evidentiary rulings on a petition for habeas corpus to determine only whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial. Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a crucial, critical, highly significant factor in the [defendant's] conviction.

*Jacobs v. Singletary*, 952 F.2d 1282, 1296 (11th Cir. 1992) (internal quotation marks and citations omitted). Harmless error review of a state criminal judgment under 28 U.S.C. § 2254 provides that "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116, 127 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). "If there is 'more than a reasonable possibility that the error contributed to the conviction or sentence,' then the error is not harmless." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1234 (11th Cir. 2014) (quoting *Mansfield v. Sec'y, Fla. Dep't of Corr.,* 679 F.3d 1301, 1313 (11th Cir. 2012)).

Here, Petitioner has not established that the state court's denial of this ground is contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts considering the evidence presented. The evidence of Petitioner's guilt was substantial, if not overwhelming, even excluding the statements contained in the post-October 30, 2017 recorded calls. This evidence included the recorded calls of Petitioner and his co-conspirators occurring during the conspiracy, Petitioner's co-defendants' testimony regarding Petitioner's conduct and involvement in the offenses, and the investigating officers' testimony describing their observations of Petitioner and the other co-conspirators actions. Considering the substantial evidence of Petitioner's guilt, the Court concludes that if the admission of the post-October 30, 2017 recorded calls was erroneous, the error was harmless because it did not have a substantial and injurious effect or influence on the jury's verdict. Accordingly, Ground One is denied under § 2254(d).

**B. Ground Two**

Petitioner contends appellate counsel rendered ineffective assistance by failing to argue that the trial court erred by denying his for cause challenge of juror number 25 ("Juror 25"). (Doc. # 1 at 7.) To support this ground, Petitioner notes that Juror 25 was the "assistant manager for Sutherland and used to write violations which were [akin] to a prosecution in a civil matter which implies both actual bias and implied bias. . . ." (*Id.*)

Petitioner raised this ground in his state habeas petition. (Doc. # 17-2 at 92–95.) The Fifth DCA summarily denied the petition. (*Id.* at 130.)

The state court's denial of this ground is not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts. Under

Florida law, "[a]ppellate counsel is not ineffective for failing to raise issues not preserved for appeal." *Rodriguez v. State*, 919 So. 2d 1252, 1281 (Fla. 2005). "[A]n exception is made where appellate counsel fails to raise a claim which, although not preserved at trial, represents fundamental error." *Id.* A fundamental error is one that "'reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" *Id.* (quoting *State v. Delva*, 575 So. 2d 643, 644–45 (Fla. 1991)).

Petitioner concedes that this issue was not preserved for appeal and does not constitute fundamental error under Florida law. (Doc. # 23 at 3–4.) Consequently, appellate counsel was not deficient for failing to raise the unpreserved issue on appeal, and prejudice did not result from counsel's failure to do so. Accordingly, Ground Two is denied under § 2254(d).

**C. Ground Three**

Petitioner maintains appellate counsel was ineffective for failing to assert that the sentence was vindictively imposed because he did not accept a plea. (Doc. # 1 at 8, 16–17.) Petitioner argues that he complained to the trial court before trial that counsel insisted he take the State's fifteen-year plea offer, and defense counsel told the trial court that Petitioner had an opportunity to "work toward a lower plea[,]" but law enforcement found Petitioner's assistance was insufficient to justify a reduction. (*Id.* at 16.) He notes that after trial, the prosecutor argued that the trial court should apply the "trafficker enhancement" and impose a forty-year sentence. Defense counsel countered that a forty-year sentence would penalize Petitioner for going to trial, and counsel sought a downward departure sentence. (*Id.*) The trial court, however, applied the trafficker enhancement, imposed a twenty-five-year sentence, and later resentenced Petitioner without the trafficker enhancement to the same sentence,

which was above the calculated guideline range. (*Id.*) And, as argued by defense counsel, Petitioner received the greatest sentence of all the conspirators and was the only one who proceeded to trial. (*Id.* at 16–17.)

Petitioner raised this ground in his state habeas petition. (Doc. # 17-2 at 95–98.) The Fifth DCA summarily denied the petition. (*Id.* at 130.)

"The imposition of a longer sentence than a defendant would have received had he pleaded guilty does not automatically amount to punishment for the defendant's exercising his right to stand trial." *Creed v. Dep't of Corr.*, 330 F. App'x 771, 773 (11th Cir. 2009) (citing *Frank v. Blackburn*, 646 F.2d 873, 882-83 (5th Cir. 1980), *modified on other grounds*, 646 F.2d 902 (5th Cir. 1981)). For instance, "[a] trial judge may reasonably increase a defendant's sentence after trial because the trial gives the judge the benefit of hearing testimony, becoming aware of the facts of the case, and understanding 'the flavor of the event and the impact upon any victims.'" *Id.* (quoting *Frank*, 646 F.2d at 885).

"Florida courts examine the totality of the circumstances to determine whether there is a 'reasonable likelihood' that a sentence evidences reprisal by the trial court." *Banner v. Sec'y, Fla. Dep't of Corr.*, 659 F. App'x 1005, 1011 (11th Cir. 2016) (citing *Wilson v. State*, 845 So. 2d 142, 156 (Fla. 2003)). Factors to be considered include "[1] whether the trial judge initiated the plea discussion with the defendant; [2] whether the judge urged the defendant to plead guilty or suggested his sentence 'would hinge on future procedural choices, such as exercising the right to trial'; [3] 'the disparity between the plea offer and the ultimate sentence imposed'; and [4] 'the lack of any facts. . . [to] explain the reason for the increased sentence other than that the defendant exercised his. . . right to a trial.'" *Id.* (quoting *Wilson*, 845 So. 2d 156).

Considering the record, Petitioner has not established that the state court's denial of this ground is contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts. At Petitioner's resentencing hearing, defense counsel argued that Petitioner's co-defendants received lesser sentences than Petitioner, and counsel asked for sentencing uniformity. (Doc. # 17-1 at 1108–09.) In imposing the same sentence of twenty-five years, the trial court explained:

> As I said, the reason I sentenced him to 25 years had nothing to do with the scoresheet. The pleas that were entered in the other cases were plea deals that were cut with the State Attorney's Office for a variety of reasons much of which I'm not privy to.
>
> In his case, at the time that the Court -- and I talked to him about this before his trial started. At the time that the Court was presented with a plea offer of 15 years, I really didn't know much about the case. There was not a lot of information. I had heard some factual basis on a couple of pleas, but I did not know what his involvement was.
>
> During the trial, I heard evidence[,] and the jury found him guilty of bringing large quantities of cocaine into the state of Florida with the intention of distributing it. Mr. Lugo's behavior was fleshed out for the Court[,] and I learned a great deal more about his involvement and what he had done in this case, than what I knew at the time that the 15-year plea offer was made. And the sentence that I imposed at that time was the one that I felt was appropriate[,] and it is the one that I continue to think is appropriate.

(*Id.* at 1112–13.)

From the state court record, there is no evidence that the trial judge initiated plea discussions with Petitioner, urged him to enter a plea, or implied that Petitioner's sentence hinged on his decision to exercise his right to trial. Although Petitioner received a greater sentence than the fifteen-year plea offer and the sentences of his co-defendants, his sentence

was statutorily permissible and was predicated on the facts the trial judge learned at trial about Petitioner's involvement in the offenses, including the substantial amount of cocaine Petitioner intended to distribute in Florida. In sum, there is "no reason to attribute [Petitioner's] increased sentence to anything other than the trial judge's more accurate appraisal of the circumstances after hearing the full disclosure of the facts at trial." *Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988) (quoting *Frank,* 646 F.2d at 885). Consequently, Petitioner has not "demonstrated 'a realistic likelihood of vindictiveness' on the part of the sentencing judge." *Id.* (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). Appellate counsel, therefore, was not deficient for failing to raise this issue, and a reasonable probability does not exist that the outcome of the appeal would have been different had counsel done so. Accordingly, Ground Three is denied under § 2254(d).

**D. Ground Four**

Petitioner asserts appellate counsel rendered ineffective assistance by failing to challenge the sentencing disparity between him and his co-defendants. (Doc. # 1 at 10.) To support this ground, Petitioner argues that under Florida law a sentencing disparity can constitute a manifest injustice that can be raised at any time. (*Id.*)

Petitioner raised this ground in his state habeas petition. (Doc. # 17-2 at 98–100.) The Fifth DCA summarily denied the petition. (*Id.* at 130.)

Under Florida law, "[d]isparate treatment of similarly situated co-defendants can result in manifest injustice, warranting habeas relief." *Johnson v. State*, 226 So. 3d 908, 910 (Fla. 4th DCA 2017). The Florida Supreme Court, however, has rejected claims of disparate sentencing when "the codefendant's lesser sentence was the result of a plea agreement or prosecutorial

discretion. . . ." *Kight v. State*, 784 So. 2d 396, 401 (Fla. 2001). "In a criminal case not involving the death penalty, a sentence 'violates the Equal Protection Clause only if it reflects disparate treatment of similarly situated defendants lacking any rational basis.'" *Love v. State*, 282 So. 3d 1003, 1004 (Fla. 1st DCA 2019) (quoting *Peters v. State*, 128 So. 3d 832, 853 (Fla. 4th DCA 2013)).

As recognized by defense counsel, Petitioner's co-defendants entered pleas. (Doc. # 17-1 at 1108–09.) Moreover, as discussed above, the trial judge provided a rational basis for sentencing Petitioner to a greater sentence than his co-defendants, namely the facts the judge learned at trial about Petitioner's conduct and involvement in the offenses. Appellate counsel, therefore, had no legal basis on which to challenge the disparity between the sentences of Petitioner and his co-defendants. Likewise, a reasonable probability does not exist that the outcome of the appeal would have been different had counsel raised the sentencing disparity. Accordingly, Ground Four is denied under § 2254(d).

**E. Ground Five**

Petitioner next alleges that appellate counsel was ineffective for failing to argue that the trial court erred by denying his motion for judgment of acquittal. (Doc. # 1 at 18.) According to Petitioner, the evidence did not support his convictions because there was no direct evidence that he touched the cocaine or any evidence that he "agreed, conspired, combined, or confederated with another person" to commit any offense. (*Id.*)

Petitioner raised this ground in his state habeas petition. (Doc. # 17-2 at 100–03.) The Fifth DCA summarily denied the petition. (*Id.* at 130.)

The state court's denial of this ground is not contrary to, or an unreasonable application

of, clearly established federal law or an unreasonable determination of the facts. As discussed in Ground One *supra*, and contrary to Petitioner's arguments otherwise, (*see* Docs. # 1 at 18; 23 at 5–7), the evidence of Petitioner's guilt was substantial. This evidence included, among other things, recorded calls between Petitioner and other co-conspirators arranging or discussing the delivery, movement, or receipt of packages of cocaine and the testimony of Marquez, Ocasio, and Calderon detailing Petitioner's actions and involvement in the offenses. (*See, e.g.,* Doc. 17-1 at 322–53, 355–77, 380–409, 414–27, 514, 516–29.) As concluded by the trial court, (*see* Doc. # 17-1 at 750–57), the State presented sufficient evidence supporting the charges against Petitioner, and the arguments raised in the motion for judgment of acquittal were questions for the jury to decide. Appellate counsel, therefore, was not deficient for failing to raise a non-meritorious claim. Moreover, a reasonable probability does not exist that the outcome of the appeal would have been different had counsel raised the issue. Accordingly, Gour Five is denied under § 2254(d).

**F. Ground Six**

Petitioner asserts appellate counsel rendered ineffective assistance by failing to argue that his convictions and sentences violate his right against double jeopardy. (Doc. # 1 at 19.) To support this ground, Petitioner argues that "[t]he entire prosecution's case was based upon what transpired on October 30, 2017, which occurred as a continued criminal episode in a couple of hours, and involves the two kilos of cocaine that were the subject of the prosecution." (*Id.*) He notes that the predicates to sustain the racketeering charge (Count One) were based on the same facts of Counts Two, Three, and Four. (*Id.*)

Petitioner raised this ground in his state habeas petition. (Doc. # 17-2 at 103–05.) The

Fifth DCA summarily denied the petition. (*Id.* at 130.)

Florida law, like federal law, prohibits "multiple punishments for the same offense." *Lee v. State*, 223 So. 3d 342, 347 (Fla. 1st DCA 2017) (quoting *Ohio v. Johnson*, 467 U.S. 493, 498 (1984)). To determine "whether multiple convictions violate double jeopardy principles, courts must ask whether the Legislature intended to recognize separate crimes." *Richardson v. State*, 969 So. 2d 535, 537–38 (Fla. 1st DCA 2007). "Absent a specific statement of legislative intent, the Legislature requires that courts apply the test set forth in" *Blockburger v. United States*, 284 U.S. 299 (1932). *Id.* at 538. "Under the *Blockburger* test, whether multiple offenses occurred turns on 'whether there are multiple victims, whether the offenses occurred in multiple locations, and whether there has been a 'temporal break' between offenses.'" *Id.* (quoting *State v. Paul*, 934 So. 2d 1167, 1172 (Fla. 2006)). For instance, "[t]wo convictions for possession of cocaine at the same time and place violate double jeopardy principles." *Id.* at 537.

Florida courts have determined that convictions for racketeering in violation of Florida's Racketeer Influence and Corrupt Organization ("RICO") Act and for the predicate offenses underlying the RICO charge, such as convictions for sale and delivery of drugs, do not violate double jeopardy. *Carroll v. State*, 459 So. 2d 368, 369–70 (Fla. 5th DCA 1984). This is because "[b]y establishing the RICO Act, the legislature clearly intended that those persons who engage in a pattern of criminal activity be punished more severely than those convicted only of one of the predicate offenses." *Id.*

Here, Petitioner was convicted of racketeering (Count One), two counts of trafficking 400 grams or more of cocaine (Counts Two and Three), and one count of conspiracy to traffic

400 grams or more of cocaine (Count Four), and the offenses occurred on October 30, 2017. (Doc. # 17-1 at 17–27, 60–62.) However, as to the two trafficking convictions, Count Two was for the kilogram of cocaine found in Petitioner's vehicle during a traffic stop on October 30, 2017, which occurred around 8:00 p.m., while Count Three was for the postal package containing a kilogram of cocaine that was retrieved outside at Petitioner's apartment complex after Petitioner's traffic stop. (Docs. # 17-1 at 60–61, 301–03, 576, 818–2; 17-2 at 31–33.) Thus, the cocaine was found at different locations and at different times. Consequently, the evidence supported a finding that the trafficking offenses (Counts Two and Three) were separate criminal transactions or episodes and did not violate double jeopardy. *See, e.g.*, *Robinson v. State,* 246 So. 3d 548, 550 (Fla. 1st DCA 2018) (concluding that convictions for sale or manufacture of methamphetamine and possession of methamphetamine with intent to sell did not violate double jeopardy "because the offenses involve[d] different forms of methamphetamine found at different locations [—home and car—] at different times, [and thus,] the record . . . establishe[d] that the offenses involve[d] different criminal episodes or distinct acts, or both."); *Richardson,* 969 So. 2d at 539 (concluding that two convictions for sale of cocaine did not violate double jeopardy because the petitioner "engaged in two discrete transactions involving discrete physical deliveries both of drugs and of money. Their temporal proximity notwithstanding, the sales constituted separate criminal acts and support separate criminal convictions."); *but see Wiles v. State*, 162 So. 3d 342, 343 (Fla. 2d DCA 2015) ("Convictions for both conspiracy to commit drug trafficking and conspiracy to commit racketeering violate double jeopardy principles when the evidence establishes only a single conspiracy with multiple objectives, including racketeering and drug trafficking.").

Likewise, Florida courts have held that convictions for trafficking cocaine and conspiracy to traffic cocaine do not violate double jeopardy. *See, e.g., Landa v. State,* 539 So. 2d 593, 593–94 (Fla. 2d DCA 1989) ("[T]he separate convictions for possession and delivery of cocaine and for the trafficking and conspiracy to traffic in cocaine do not violate the double jeopardy rule."); *see also* Fla. Stat. § 893.135(5) ("Any person who agrees, conspires, combines, or confederates with another person to commit any act prohibited by subsection (1) commits a felony of the first degree and is punishable as if he or she had actually committed such prohibited act. *Nothing in this subsection shall be construed to prohibit separate convictions and sentences for a violation of this subsection and any violation of subsection (1).*") (emphasis added). In addition, "'the Florida RICO Act. . . [was] enacted to allow for prosecution of the major offense as well as the predicate offenses.'" *State v. Levitan*, 115 So. 3d 1065, 1067 (Fla. 1st DCA 2013) (quoting *Headley v. State*, 90 So. 3d 912, 914–15 (Fla. 3d DCA 2012)). Thus, "'being convicted of RICO as well as the necessarily lesser included offenses does not violate double jeopardy.'" *Id.* (quoting *Headley,* 90 So. 3d at 914–15).

In sum, Petitioner's convictions do not violate double jeopardy. Appellate counsel, therefore, was not deficient for failing to raise a double jeopardy claim. *See, e.g., Hope v. Crosby*, No. 3:03 CV 524 RS/EMT, 2006 WL 290516, at *8 (N.D. Fla. Feb. 7, 2006) (denying ineffective assistance of counsel claim based on counsel's failure to advise the petitioner that convictions for trafficking cocaine and conspiracy to traffic cocaine violated double jeopardy because "the Florida legislature clearly intended that conspiracy to traffic in cocaine and trafficking in cocaine be separate offenses"). Prejudice also did not result from appellate counsel's failure to raise this argument. Accordingly, Ground Six is denied under § 2254(d).

**G. Ground Seven**

Petitioner next asserts that trial counsel rendered ineffective assistance by searching the internet on his laptop during much of the trial. (Doc. # 1 at 20.) According to Petitioner, trial counsel was using his laptop "[e]very time the prosecutor was questioning witnesses[.]" (*Id.*)

Petitioner raised this ground in his Rule 3.850 motion. (Doc. # 17-2 at 217–18.) The state court denied relief under *Strickland*. (*Id.* at 261–62.) The state court reasoned that the ground was conclusory. (*Id.* at 262.) The Fifth DCA affirmed *per curiam*. (*Id.* at 387.)

The state courts' denial of this ground is not contrary to, or an unreasonable application of, clearly established federal law or an unreasonable determination of the facts. "[I]neffective assistance of counsel cannot be proven via conclusory assertion. . . ." *Wilson v. Sec'y, Fla. Dep't of Corr.*, 769 F. App'x 825, 827 (11th Cir. 2019). Petitioner does not explain how trial counsel's use of his laptop during the trial prejudiced the defense. For instance, Petitioner does not identify any deficient performance by counsel caused by counsel's computer usage, such as failing to object to improper questions or the erroneous admission of evidence or failing to sufficiently cross-examine witnesses or present exculpatory evidence. (*See* Docs. # 1 at 20; 23 at 10–11.) Consequently, this ground is conclusory, and Petitioner has not demonstrated either deficient performance or prejudice. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (holding that vague, conclusory, speculative, or unsupported claims cannot establish ineffective assistance of counsel). Accordingly, Ground Seven is denied under § 2254(d).

**H. Ground Eight**

Petitioner contends trial counsel was ineffective for failing to properly inform him of

the consequences of not accepting the State's fifteen-year plea offer and by allowing the offer to expire. (Doc. # 1 at 21.) To support this ground, Petitioner complains that trial counsel was not present in court the day that he would have entered the plea but instead sent another attorney to stand in for him. (*Id.*) Petitioner argues that the stand-in attorney was unaware of the plea negotiations and the trial court would have accepted the plea. (*Id.*)

Petitioner raised this ground in his Rule 3.850 motion. (Doc. # 17-2 at 218–20.) The state court denied relief, reasoning:

> On April 4, 2018, [Petitioner], along with his attorney and a Spanish Interpreter, appeared before the Court for a hearing. The State placed the plea offer on the record and indicated the offer was open until April 6, 2018. The Court advised counsel that he was to inform the Court in writing by the deadline if Defendant wished to accept the plea offer. Then, on April 19, 2018, the parties appeared before the Court for another hearing. Attorney Sergio Cruz, who was covering for Mr. Bano, advised the Court that Defendant did not wish to plea and mentioned holding a *Nelson* hearing. Later, at the start of trial, Mr. Bano informed the Court that he had been under the impression that Defendant did want to enter a plea. However, counsel had been informed that Defendant advised Attorney Cruz that he wished to go to trial and wanted a new lawyer. Mr. Bano stated, and the State confirmed, that the plea offer was no longer available and Defendant would be proceeding to trial.
>
> The Court then held a *Nelson* hearing. Defendant claimed counsel had never "interview[ed]" him and had ignored Defendant's attempts to establish communication. He stated that counsel did nothing aside from dropping off the discovery and telling him to accept the fifteen year plea offer. In response, counsel stated:
>
> > We have -- I have explained to Mr. Lugo the – we've gone over in detail about the facts of the case, discussed with him his exposure, the possible risks of trial. Mr. Lugo wants a better plea deal. He always tells me that he's not a violent person; it's the first time. I've run that --

> communicated that to the State. I've tried to negotiate with the State. Mr. Lugo had an opportunity to work [sic] lower than the 15; however, the -- the testimony provided to the MBI agents was not satisfactory to them.
>
> We – I've done everything I can to get him a better plea deal. He -- I -- the State is -- 15 was the number that the State was -- was staying at, and the State wouldn't go lower than that. The other option was trial. However, Mr. Lugo, when I discussed this with him, initially, he wanted trial, then he goes back and forth between trial, then plea. So the last word I have from him, is that he wants a trial and he's innocent. So here we are for trial now.
>
> At the conclusion of the hearing, the Court found that Mr. Bano was not ineffective. As the State contends in its Response, the record refutes Defendant's claim that he was "ready and willing to plead guilty."
>
> After reviewing the trial transcripts, the Court finds [Petitioner's] claim lacks merit and is therefore denied.

(*Id.* at 262–64) (citations and footnote omitted). The Fifth DCA affirmed *per curiam*. (*Id.* at 387.)

The Sixth Amendment right to effective assistance of counsel extends to plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). "[D]efense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012). Further, "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler*, 566 U.S. at 168. The two-part test enunciated in *Strickland* applies to claims that counsel was ineffective during plea negotiations. *See id.* at 163

(recognizing that *Strickland*'s two-part test applies to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer).

With respect to the prejudice inquiry in the context of a foregone guilty plea, defendants must demonstrate:

> a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*Frye*, 566 U.S. at 147.

The record reflects that the State offered Petitioner a fifteen-year plea offer, which was conveyed to him and was placed on the record on April 4, 2018. (Doc. # 17-2 at 322.) The offer was set to expire on Friday, April 6, 2018, and the trial court directed Petitioner's counsel to notify the court in writing by that day if Petitioner wanted to accept the offer. (*Id.*) On April 19, 2018, Sergio Cruz ("Cruz"), an attorney appearing on behalf of Petitioner's trial counsel, Eneid Bano ("Bano" or "trial counsel"), advised the trial court that Petitioner did not want to enter a plea and mentioned a *Nelson*[3] hearing. (*Id.* at 324.)

On April 23, 2018, the day Petitioner's trial began, Bano told the judge that the last

[3] *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973) (if a defendant expresses his desire to discharge his court appointed counsel prior to trial, the trial court will hold a *Nelson* hearing to determine whether there is reasonable cause to believe that the court appointed counsel is not rendering effective assistance to the defendant).

time he spoke with Petitioner, Petitioner wanted to plea. (Doc. # 17-1 at 237.) Bano, however, was unable to attend the April 19, 2018 hearing and sent Cruz to cover for him. (*Id.*) Consistent with Cruz's representations at the hearing, Bano indicated that Petitioner advised Cruz that he wanted a new attorney and to proceed to trial. (*Id.*)

The trial court then conducted a *Nelson* hearing at which Petitioner complained that "no one ha[d] ever come to interview [him]" and Bano did not answer his phone calls. (*Id.* at 245.) Regarding Petitioner's complaints, Bano told the trial court that he met with Petitioner on February 3, 2018, and gave him his discovery, met with Petitioner on March 16, 2018, met with Petitioner, the state attorney, and MBI agents for a proffer on March 23, 2018, and spoke with Petitioner a few times at the courthouse. (*Id.* at 246–47.) Bano also met with Petitioner at the jail on April 6, 2018. (*Id.*)

In response to Bano's representations, Petitioner expressed that he felt that he and Bano had not had enough communication for him to feel satisfied about the work Bano was doing on the case. (*Id.* at 247.) Petitioner complained that "[t]he only thing that [Bano] always told me, is that I should take the 15 years' offer." (*Id.*) Bano responded by telling the trial court that he had gone over the case in detail with Petitioner, including his sentence exposure and the possible risks of proceeding to trial, but that Petitioner wanted a better plea deal than the fifteen-year offer. (*Id.* at 248.) Bano said he attempted to obtain a better offer, but the State was unwilling to offer less than fifteen years. Bano maintained that when he discussed the matter with Petitioner, he initially wanted to go to trial, then Petitioner indicated he wanted to plea, but ultimately Petitioner said he was innocent and wanted to go to trial. (*Id.*)

Considering Petitioner's and Bano's representations, the Court cannot conclude that

the state courts' denial of this ground is contrary to, or an unreasonable application of, *Frye* or an unreasonable determination of the facts. Petitioner admitted that Bano consistently advised him to accept the fifteen-year plea offer. Bano indicated that he advised Petitioner of the consequences of proceeding to trial. Nevertheless, from Bano's representations to the trial court, which were not refuted by Petitioner, Petitioner ultimately was unwilling to accept the fifteen-year plea offer because he wanted a better offer and maintained his innocence. Petitioner, therefore, chose to reject the plea offer and to proceed to trial after being advised of the consequences of doing so. Consequently, Petitioner has not demonstrated that counsel was deficient or that a reasonable probability exists that Petitioner would have accepted the fifteen-year plea offer but for counsel's alleged failure to adequately advise Petitioner of the consequences of rejecting the plea offer. Accordingly, Ground Eight is denied under § 2254(d).

**I. Ground Nine**

Petitioner asserts trial counsel rendered ineffective assistance by failing to properly preserve the denial of his for-cause challenge of Juror 25 for appellate review. (Doc. # 1 at 22.) According to Petitioner, Juror 25's statements indicating that the juror had been an assistant manager for Sutherland and used to write violations, which Petitioner likens to a civil prosecution, evinced actual and implied bias. (*Id.* at 7, 22.)

Petitioner raised this ground in his Rule 3.850 motion. (Doc. # 17-2 at 220–23.) In denying relief, the state court concluded that Petitioner failed to establish deficient performance or prejudice. (*Id.* at 265.) The Fifth DCA affirmed *per curiam*. (*Id.* at 387.)

As explained by the Eleventh Circuit:

> A criminal defendant has a right to an impartial jury, and a prospective juror who lacks impartiality must be excused for cause. *See Ross v. Oklahoma*, 487 U.S. 81, 85–86, 108 S. Ct. 2273, 2277, 101 L.Ed.2d 80 (1988). To exclude a prospective juror for cause, a party "must demonstrate that the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed." *United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993) (emphasis added); *see also Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 945, 71 L.Ed.2d 78 (1982). The burden is on the challenger to show the prospective juror has actual bias, so as to raise the presumption of partiality. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). Moreover, the U.S. Supreme Court has upheld a trial court's seating of a juror even where the juror gave conflicting or ambiguous answers during voir dire about his ability to be impartial. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1038–40, 104 S. Ct. 2885, 2892–93, 81 L.Ed.2d 847 (1984); *Murphy v. Florida*, 421 U.S. 794, 801–03, 95 S. Ct. 2031, 2037–38, 44 L.Ed.2d 589 (1975).
>
> Under Florida law, the test at trial "for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." *Lusk v. State*, 446 So. 2d 1038, 1041 (Fla. 1984). The trial court must grant a party's motion to strike a prospective juror for cause if there is "any reasonable doubt" as to the juror's impartiality. *Singer v. State*, 109 So. 2d 7, 23 (Fla. 1959).

*Fennell v. Sec'y, Fla. Dep't of Corr.*, 582 F. App'x 828, 832 (11th Cir. 2014). In considering whether prejudice resulted from trial counsel's failure to preserve the denial of a for-cause challenge for appellate review, the relevant inquiry is whether "a reasonable probability exists that, but for counsel's failure to preserve [the issue], the outcome on appeal would have been different." *Bilotti v. Fla. Dep't of Corr.*, 133 F.4th 1320, 1330 (11th Cir. 2025).

Here, the fact that Juror 25 had previously had a job in which she wrote "violations" that were akin to civil prosecutions does not establish that the juror was actually biased. There

is no indication that Juror 25 made an express admission of bias. Likewise, the juror's prior employment did not demonstrate such a close connection to Petitioner's case that bias had to be presumed. In denying Petitioner's for-cause challenge of Juror 25, the trial court found that the juror "didn't say one thing about being unfair or not being able to follow the law[.]" (Doc. # 17-1 at 265.) Consequently, Petitioner has not shown that Juror 25 was unable to lay aside any bias or prejudice and render her "verdict solely upon the evidence presented and the instructions on the law given to [her] by the court." *Lusk*, 446 So. 2d at 1041. Trial counsel, therefore, was not deficient for failing to preserve the for-cause challenge for appellate review, and a reasonable probability does not exist that Petitioner would have prevailed on appeal had counsel done so. Accordingly, Ground Nine is denied under § 2254(d).

**J. Ground Ten**

Petitioner maintains trial counsel rendered ineffective assistance by failing to cite legal authority to support his argument against the sentencing disparity between him and his co-defendants. (Doc. # 1 at 24.) Petitioner argues that the crux of this ground is that trial counsel was ineffective in advising him concerning whether to accept the plea or proceed to trial. (*See* Doc. # 23 at 16.) Petitioner does not specify what legal authority trial counsel should have cited. (*See* Docs. # 1 at 24; 26 at 15–16.)

Petitioner raised this ground in his Rule 3.850 motion. (Doc. # 17-2 at 223–26.) In denying relief, the state court concluded that none of the cases cited by Petitioner "bound the sentencing judge to adopt the sentence of a co-defendant who entered into a negotiated plea." (*Id.* at 266.) The court further noted that, under Florida law, claims of disparate sentencing are without merit when the co-defendant's lesser sentence was the result of a plea agreement

or prosecutorial discretion. (*Id.* (citing *Kight*, 784 So. 2d at 401)). The Fifth DCA affirmed *per curiam*. (*Id.* at 387.)

As the state court indicated, and as discussed *supra* in Ground Four, the Florida Supreme Court has rejected claims of disparate sentencing when "the codefendant's lesser sentence was the result of a plea agreement or prosecutorial discretion. . . ." *Kight*, 784 So. 2d at 401. Here, at sentencing, the trial judge explained that the lesser sentences of Petitioner's co-defendants were the result of plea deals provided in the prosecutor's discretion. (Doc. # 17-1 at 1112.) In contrast, Petitioner did not enter a plea, and Petitioner's sentence was predicated on the evidence the judge heard at trial regarding the offenses and Petitioner's behavior and involvement in the offenses. (*Id.* at 1112–13.) Petitioner, therefore, has not established a reasonable probability exists that he would have received a lesser sentence had counsel cited legal authority regarding disparate sentences. Accordingly, Ground Ten is denied pursuant to § 2254(d).

**K. Ground Eleven**

Petitioner asserts trial counsel was ineffective for failing to move to dismiss the Information because the racketeering charge (Count One) and predicate offenses (Counts Two, Three, and Four) were based on the same facts. (Docs. # 1 at 25, 23 at 16–17.) Essentially, Petitioner argues that the Information was subject to dismissal based on violation of double jeopardy as argued in Ground Six. (*Id.*)

Petitioner raised this ground in his Rule 3.850 motion. (Doc. # 17-2 at 226–27.) The state court determined that counsel was not deficient for failing to move to dismiss Petitioner's convictions based on double jeopardy. (*Id.* at 267–68.) The state court reasoned that the

Florida Legislature intended to impose cumulative punishments under separate statutes based on the same conduct for racketeering and the predicate offenses of trafficking cocaine and conspiracy to traffic cocaine. (*Id.*) The state court concluded, therefore, that counsel was not ineffective for failing to raise a non-meritorious argument. (*Id.* at 268.) The Fifth DCA affirmed *per curiam*. (*Id.* at 387.)

Petitioner has not established that the state courts' denial of this ground is contrary to, or an unreasonable application of, clearly established federal law. As discussed *supra* in Ground Six, Petitioner's convictions do not violate double jeopardy. Consequently, trial counsel was not deficient for failing to move to dismiss the Information on this basis, and a reasonable probability does not exist that the outcome of the proceeding would have been different had counsel done so. Accordingly, Ground Eleven is denied pursuant to § 2254(d).

**L. Ground Twelve**

Finally, Petitioner contends that the cumulative errors of appellate and trial counsel in Grounds Two through Eleven deprived him of his right to a fair trial. (Doc. # 1 at 25.) Petitioner raised this ground in the state court in his state habeas petition and his Rule 3.850 motion. (Doc. # 17-2 at 105–06, 227–29.) The state courts summarily denied relief. (*Id.* at 130, 268.)

Because none of Petitioner's individual grounds warrants relief, there is no error to accumulate. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). The alleged errors, neither individually nor cumulatively, deprived Petitioner of a fair trial or due process. Therefore, the state court's decision was neither contrary to, nor an unreasonable application of, federal law and was not based on an unreasonable determination of the facts. *See* 28 U.S.C.

§ 2254(d). Accordingly, Ground Twelve is denied.

Any allegations not specifically addressed lack merit.

## IV. CERTIFICATE OF APPEALABILITY

This Court should grant an application for certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009). When a district court dismisses a federal habeas petition on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue only when a petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*; *Lamarca*, 568 F.3d at 934. But a prisoner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Petitioner has not shown that reasonable jurists would find the Court's assessment of the constitutional claims debatable or wrong. Petitioner has failed to make a substantial showing of the denial of a constitutional right. Thus, the Court will deny Petitioner a certificate of appealability.

## V. CONCLUSION

For the reasons stated here, the Petition is denied.

Accordingly, it is now

**ORDERED** and **ADJUDGED** that:

1. The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED with prejudice**.
2. Petitioner is **DENIED** a Certificate of Appealability.
3. The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on November 13, 2026.

**ANNE-LEIGH GAYLORD MOE**
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party